[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] OPINION
This matter is before us on Stanley Buxton's appeal from the revocation of his probation in two criminal cases. Buxton was originally sentenced in 1996 to six months on a forgery charge and three to fifteen years on a burglary charge. The sentences were to run concurrently, but were suspended. Buxton was then placed on probation for five years under the supervision of the Montgomery County Adult Probation Department. However, on November 12, 1997, a Notice of Revocation Hearing and Order was filed, based on Buxton's arrest for the offenses of aggravated robbery and criminal endangering on October 29, 1997. Subsequently, the trial court held hearings on the probation revocation and decided to revoke probation. From this decision, Buxton appeals, raising the following assignments of error:
 I. The trial court abused its discretion when it revoked appellant's probation.
 II. Appellant was denied due process and the trial court violated right against double jeopardy, as well as principles of collateral estoppel and res judicata
when it revoked Appellant's probation.
After considering the record and the applicable law, we find the assignments of error without merit. As a result, we affirm the decision of the trial court.
 I
As was noted above, the first assignment of error is based on the trial court's alleged abuse of discretion. According to Buxton, the court acted prejudicially and with partiality when it accepted the probation officer's testimony and rejected Buxton's equally plausible testimony. We disagree. As an initial point, we stress that the defendant's right to continue on probation is within the sound discretion of the trial court. State v. Scott
(1982), 6 Ohio App.3d 39, 41. The degree of evidence needed to justify revocation is not "beyond a reasonable doubt," but is only proof "of a substantial nature." Id. (citation omitted). And, for an abuse of discretion to occur, the trial court's attitude must be "arbitrary, unreasonable or unconscionable." State v.Lackey (Nov. 1, 1993), Champaign App. No. 93-CA-06, unreported, p. 2.
After reviewing the record, we find nothing arbitrary or unreasonable about the trial court's decision. The testimony at the revocation hearing indicated that on October 18, 1997, three men robbed a Revco store on North Main Street in Dayton. Apparently, the men were hiding in a storage area behind coolers where soft drinks, juice, and ice cream were kept. When the store closed, the men entered the store though the cooler doors and took approximately $3,600 in cash, at gunpoint. Two robbers wore masks that had been taken from the Halloween stock in the store, and one wore a stocking cap over his face. Also, the robbers were wearing what appeared to be latex gloves. The assistant manager claimed at the hearing that he had gotten a glimpse of one of the robbers, whom he later identified as Buxton. However, the manager did not tell the police he had seen or could identify one of the men, and the trial court did not rely on this fact.
Two partially full Snapple bottles were found in the area behind the coolers. One of the bottles was open, with the cap beside it. These bottles were not there earlier in the evening and were not in an area accessible by people reaching into the coolers to buy a drink. Also found in the same general area were a latex glove and an empty Rice Crispy Treat Wrapper. Buxton's fingerprints were found on the open Snapple bottle. After identifying the fingerprints, the police tried to find Buxton to question him about the robbery.
Buxton had worked at the Revco store for about a year, but was fired in June, 1996. The Snapple bottle could not have been left from the time of Buxton's employment (over a year before the robbery), because the store keeps beverages no more than three months and any stock not sold during that time is "outdated." After being fired, Buxton did still come into the store about once a week, to buy diapers and other items. Buxton admitted knowing where the storage and cooler area in the back of the store were located. However, he denied walking into that area and also denied setting a Snapple bottle down in back of the cooler or on the back of the cooler shelf. He did say he had reached into the cooler before to get juice. He did not say when, or how often this had occurred.
At the time of the robbery, and for the year before, Melissa Dues was Buxton's probation officer. After the robbery, Buxton called Dues and asked if any warrants were pending. During this conversation, Buxton told Dues the police were looking for him, but said he did not know the reason. About a week later, on October 29, 1997, Buxton again called Dues. The content of this conversation is in dispute. According to Dues, Buxton again said the police were looking for him and had searched his grandmother's house. This time, however, when Dues asked what was going on, Buxton said he had robbed a Revco on Main Street. Buxton then related details of the robbery, including the fact that he had robbed the store about two weeks before with some other people, that a gun had been used (not by Buxton), and that approximately $4,000 had been taken. Dues also testified that she had not received any information between the two phone calls about why the police were interested in Buxton.
By contrast, Buxton denied robbing the Revco store. He agreed that he had made two calls to Dues. However, his account was that he did not say he had robbed the Revco. Instead, his comment was that "they're saying I did the robbery" (meaning the police). Buxton claimed he is excitable and talks fast, leading to a misunderstanding on the probation officer's part about what he actually said. The record supports the fact that Buxton talks rapidly, as on two different occasions during his testimony, he had to be admonished to speak more slowly. Both Buxton and Dues did agree that they had no conflicts or problems in the course of the probation relationship
During the second conversation, Dues advised Buxton to turn himself in to the police. Later that day, Buxton went to the police station with an attorney and was arrested for the robbery. Ultimately, the grand jury declined to indict Buxton on the robbery charge. (The transcript of the revocation hearings does not reflect this fact. However, in its decision, the court mentioned having received information from the State to that effect).
Based on the above facts, the trial court found that Buxton had violated probation by participating in the Revco robbery. In the course of the decision, the court explicitly commented on Dues' credible demeanor and her lack of demonstrated motive for falsely testifying against Buxton.
Because the stories were conflicting, the trial court had the right to rely on the credibility of one witness as opposed to another. We have stressed many times that the factfinder is in the best position to decide which witnesses are worthy of belief and the weight to be given to witness testimony. See, e.g., Statev. Brewer (Apr. 18, 1997), Montgomery App. No. 15157, unreported. Furthermore, Buxton's fingerprints were on an opened Snapple bottle in the area where the robbers had hidden. While Buxton could conceivably have touched the bottle while getting juice from the cooler on an earlier visit to the store, such a possibility is extremely remote. Specifically, the bottle was in an area behind the cooler that was inaccessible to the public. Furthermore, photos show the open Snapple bottle located next to gallon jugs of drink or juice, not next to other Snapple bottles. Had Buxton, in fact, touched the Snapple bottle on an earlier visit, the likely location for such a bottle would be at the front of the cooler, with other similar bottles — not on a shelf at the back of the cooler area. A far more logical explanation is that Buxton was familiar with the store from his prior employment and hid in the storage area with accomplices until closing time. While waiting, they decided to drink Snapple and munch on a Rice Crispy Treat.
In light of the preceding analysis, we find no abuse of discretion on the trial court's part. Accordingly, the first assignment of error is without merit and is overruled.
 II
In the second assignment of error, Buxton contends that the revocation was barred by due process, the Double Jeopardy Clause, collateral estoppel, and res judicata. The primary argument made in this context is that Buxton should not have to answer for an offense if the grand jury refused to return an indictment. Although the trial court considered this point, it chose to followState ex rel Smith v. Adult Parole Authority (June 5, 1990), Franklin App. No. 88AP565, which held that the issuance of a "no bill" from the grand jury does not bar a subsequent parole revocation hearing. Buxton urges us to reject State ex rel Smith
and to instead follow the reasoning in People v. Grayson (1974),58 Ill.2d 260, 319 N.E.2d 43.
In Grayson, the defendant was acquitted of armed robbery after a bench trial. Substantially the same evidence was then used to revoke the defendant's probation. 319 N.E.2d at 44. After reviewing the matter, the Illinois Supreme Court applied collateral estoppel to bar the State from bringing the defendant into court in a new criminal proceeding or a probation revocation hearing. In particular, the court stressed that the final judgment in the criminal case had resolved the disputed factual issue of whether the defendant was one of the robbers. Since that issue had been previously determined, it could not be re-litigated. By analogy, Buxton contends that the grand jury's failure to return an indictment bars the State from re-litigating whether Buxton robbed the Revco store.
Ohio does not follow a rule that is different from what is set out in Grayson. For example, in State ex rel. Hickman v.Capots (1989), 45 Ohio St.3d 324, the Ohio Supreme Court affirmed the dismissal of a mandamus complaint against the Ohio Adult Parole Authority. In the complaint, a parolee alleged that the Parole Authority had unlawfully revoked his parole by relying on criminal charges which had been dismissed. According to the parolee, the dismissal removed all factual support for revocation. In rejecting the complaint, the court noted that the parolee was trying to fit within an exception to the general rule that "parole may be revoked even though criminal charges based on the same facts are dismissed, the defendant is acquitted, or a conviction is overturned." Id. Notably, the exception referred to inHickman is similar to the one relied on in Grayson, i.e., that resolution of the criminal charge has removed all factual support for revocation. The Ohio Supreme Court rejected the parolee's mandamus complaint in Hickman, but its reason was not disapproval of the exception. Instead, the court focused on the fact that the parolee failed to plead specific facts showing how or why he came within the exception. Because pleading such specific facts is required for mandamus relief, the court held that the mandamus complaint failed to state a claim.
The Ohio Supreme Court again followed this rule in State exrel. Carrion v. Ohio Adult Parole Authority (1998), 80 Ohio St.3d 637, stating that "parole may be revoked even though criminal charges based on the same facts are dismissed, the defendant is acquitted, or the conviction is overturned, unless all factual support for the revocation is removed." Id. at 638. Furthermore, in Zanders v. Anderson (1996), 74 Ohio St.3d 269, 272, the Ohio Supreme Court extended the doctrine to probation revocation cases. This extension to probation revocation removes at least one basis for Buxton's disagreement with State ex rel Smith, i.e., an alleged distinction between probation revocation and parole revocation. Specifically, Buxton contends that the court in Stateex rel Smith relied on the remedial and administrative nature of parole revocation. By contrast, Buxton claims that probation can only be revoked by a judge and also comes at a "critical stage" in the criminal proceedings because it results in the imposition of sentence.
We find this to be a distinction without a difference. Contrary to Buxton's claim, probation revocation does not result in imposition of sentence. Rather, sentence for the crime has already been imposed, but has been suspended, contingent on the probationer's compliance with various rules. This is no different than parole, which suspends the remainder of a prisoner's sentence, but only if the parolee follows certain rules. Moreover, the fact that probation revocation is decided by a judge instead of an administrative body is not significant. Instead, it simply reflects the reality that the probationer is not at that point within the penal system nor is he subject to the supervision of the administrative body established to handle releases from prison.
As an additional matter, the exception discussed in Hickman
and Zanders is inapplicable to this case. Unlike other situations where the exception has been used, jeopardy did not attach, and no resolution of the factual basis for Buxton's criminal charge occurred. In this regard, the present case is similar to State exrel Smith, which held that the grand jury's action in issuing a "no bill" did not preclude revocation of parole based on the same violation. In particular, the court focused on the fact that jeopardy does not attach to a grand jury proceeding, and stated that:
 [t]he failure of the grand jury to indict does not preclude it or another grand jury from indicting at a later point in time, and this did not place * * * the parolee] in jeopardy within the meaning of the Fifth Amendment of the United States Constitution.
Id. at p. 2. We agree with this reasoning.
In State v. Lovejoy (1997), 79 Ohio St.3d 440, the Ohio Supreme Court reviewed the history and purpose of double jeopardy and collateral estoppel. As the court pointed out, "the Double Jeopardy Clause protects against successive prosecutions for the same offense * * * [and] protects a person who has been acquitted from having to run the gauntlet a second time." Id. at 443. Additionally, the clause functions to protect "a defendant's `'valued right to have his trial completed by a particular tribunal.'" Id. (citations omitted). In this regard, "[o]nce a tribunal has decided an issue of ultimate fact in the defendant's favor, the double jeopardy doctrine also precludes a second jury from ever considering that same or identical issue in a later trial." Id. According to the court in Lovejoy, "[c]ollateral estoppel generally refers to the acquittal prong of double jeopardy," and "means simply that when an issue of ultimate fact has once been determined by a valid and final judgment, that issue cannot again be litigated between the same parties in any future lawsuit." Id. at 444 and 443.
The function of a grand jury is to inquire into offenses, to issue indictments, and to report to the court if an indictment is not found. See, R.C. 2939.08, R.C. 2939.20, and R.C. 2939.23. A grand jury does not render "final judgments," and could not, since, as was noted in State ex rel Smith, later indictment by the same or another grand jury is not prohibited, even after return of a "no bill." Additionally, State ex rel. Smith is not the only case finding that jeopardy fails to attach to grand jury proceedings. See, State v. Gonzalez (1996), 112 Ohio App.3d 19,26 ("[p]resentation of information to a grand jury does not place an individual in jeopardy within the meaning of either the United States Constitution or the Ohio Constitution."); and State v.Ahmad, (May 25, 1995), Lorain App. No. 96CA005892, unreported. This conclusion seems clear in light of the holding in State v.Larabee (1994), 69 Ohio St.3d 357, that "[j]eopardy does not attach when a trial court grants a motion to dismiss an indictment." Id. at syllabus two. Larabee also specifically relied on the United States Supreme Court decision in Serfass v.United States (1975), 420 U.S. 377, 95 S.Ct. 1055, 43 L.Ed.2d 265, which held that jeopardy did not attach even when a trial court heard evidence, stipulations, and arguments on a motion to dismiss the indictment and then granted the motion.
In view of the above analysis, we find that the grand jury's failure to indict Buxton for the Revco robbery was not a bar to the probation revocation proceeding. Consequently, the second assignment of error is without merit and is overruled. Based on the preceding discussion, both assignments of error are overruled and the judgment of the trial court is affirmed.
WOLFF, J., and FAIN, J., concur.